1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
9                                    AT TACOMA

10   DAVID F. RIGGS,

11                      Plaintiff,                 CASE NO.     C07-5242RJB-KLS

12           v.                                    REPORT AND
                                                   RECOMMENDATION
13   MICHAEL J. ASTRUE, Commissioner of
     Social Security,                              Noted for April 25, 2008
14
                       Defendant.
15

16

17        Plaintiff, David F. Riggs, has brought this matter for judicial review of the denial of his application

18   for disability insurance benefits.  This matter has been referred to the undersigned Magistrate Judge

19   pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as authorized by

20   Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After reviewing the parties' briefs and the

21   remaining record, the undersigned submits the following Report and Recommendation for the Honorable

22   Robert J. Bryan's review.

23                          FACTUAL AND PROCEDURAL HISTORY

24        Plaintiff currently is 56 years old.[1] Tr. 31.  He has a tenth-grade education and past work

25   experience as a dishwasher/kitchen helper, security guard and part-time clothing sorter. Tr. 49, 96, 550,

26   799.

27   _____

28           [1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to
     Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

On November 2, 1998, plaintiff filed an application for disability insurance benefits, alleging disability as of June 15, 1995, due to a pituitary tumor, chronic back pain, a hyper-extended left knee, depression, emphysema, esophagus reflux, and degenerative joint disease/osteoarthritis. Tr. 44-46, 55, 542. His application was denied initially and on reconsideration. Tr. 31-33, 38, 542.  A hearing was held before administrative law judge ("ALJ") Kalee Fong on September 20, 2000, at which plaintiff, represented by counsel, appeared and testified. Tr. 340-66.  On January 19, 2001, ALJ Fong issued a decision in which he determined plaintiff to be not disabled, finding specifically that he was capable of performing other jobs existing in significant numbers in the national economy. Tr. 18-25.

Plaintiff's request for review of ALJ Fong's decision was denied by the Appeals Council on September 24, 2003. Tr. 5.  An appeal was filed by plaintiff with this Court, which remanded the matter back to the Commissioner for further administrative proceedings on March 8, 2004, based on the parties' stipulation. Tr. 436-38.  On remand, the Appeals Council vacated ALJ Fong's decision (Tr. 439-40), and a second hearing was held before a different ALJ, M. J. Adams, on December 14, 2004, at which plaintiff, represented by counsel, appeared and testified, as did a medical expert and a vocational expert. Tr. 391-435.  On April 18, 2005, ALJ Adams issued a decision in which he determined plaintiff to be not disabled, finding specifically that he was capable of performing other jobs existing in significant numbers in the national economy. Tr. 380-90.

It appears the Appeals Council did not assume jurisdiction of the case. 20 C.F.R. § 404.984.  On February 9, 2006, in response to plaintiff's appeal of ALJ Adams' decision, this Court again remanded this matter back to the Commissioner for further administrative proceedings. Tr. 607-12.  The Appeals Council then vacated ALJ Adams' decision pursuant to the Court's order. Tr. 601-06.  On January 9, 2007, a third hearing was held before ALJ Adams, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 794-834.  On March 29, 2007, ALJ Adams issued a decision in which he again determined plaintiff to be not disabled, finding specifically in relevant part:

(1)     at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability;

---

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

(2)    at step two, plaintiff had "severe" impairments consisting of a status post pituitary tumor, left knee degenerative joint disease, an affective disorder, a personality disorder, and low average intellectual functioning;

(3)    at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4)    at step four, plaintiff had the residual functional capacity to perform sedentary work, with certain other non-exertional limitations, which precluded him from performing his past relevant work; and

(5)    at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 542-52.  Again, it does not appear from the record that the Appeals Council assumed jurisdiction of the case. 20 C.F.R. § 404.984.  The ALJ's decision therefore became the Commissioner's final decision after sixty days. Id.

On May 11, 2007, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1-#3).  The administrative record was filed with the Court on July 31, 2007. (Dkt. #10). Specifically, plaintiff argues that decision should be reversed and remanded for an award of benefits for the following reasons:

(a)    the ALJ erred in evaluating the medical evidence in the record;

(b)    the ALJ erred in assessing plaintiff's credibility;

(c)    the ALJ erred in evaluating the lay witness evidence in the record;

(d)    the ALJ erred in assessing plaintiff's residual functional capacity; and

(e)    the ALJ erred in finding plaintiff capable of performing other work existing in significant numbers in the national economy.

The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, recommends that while the ALJ's decision should be reversed, this matter should be remanded to the Commissioner for further administrative proceedings.  Although plaintiff requests oral argument in this matter, the undersigned finds such argument to be unnecessary here.

<u>DISCUSSION</u>

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision.  <u>Hoffman v. Heckler</u>, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Richardson</u>

v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than

a scintilla but less than a preponderance.  Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir.

1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than

one rational interpretation, the Court must uphold the Commissioner's decision.  Allen v. Heckler, 749

F.2d 577, 579 (9th Cir. 1984).

I.    Plaintiff's Last Date Insured

       To be entitled to disability insurance benefits, plaintiff "must establish that [his] disability existed

on or before" the date his insured status expired. Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998); see

also Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1460 (9th Cir. 1995) (social security

statutory scheme requires disability to be continuously disabling from time of onset during insured status

to time of application for benefits, if individual applies for benefits for current disability after expiration of

insured status).  Plaintiff's date last insured was December 31, 1999. Tr. 544.  Therefore, to be entitled to

disability insurance benefits, plaintiff must establish he was disabled prior to or as of that date. Tidwell,

161 F.3d at 601.

II.   The ALJ's Evaluation of the Medical Evidence in the Record

       The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in

the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions

of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion

must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th

Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact

inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts

"falls within this responsibility." Id. at 603.

       In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a

detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the

evidence." Sample, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences

1  from the ALJ's opinion." <u>Magallanes v. Bowen</u>, 881 F.2d 747, 755, (9th Cir. 1989).

2      The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

3  either a treating or examining physician. <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

4  treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific

5  and legitimate reasons that are supported by substantial evidence in the record." <u>Id.</u> at 830-31.  However,

6  the ALJ "need not discuss *all* evidence presented" to him or her. <u>Vincent on Behalf of Vincent v. Heckler</u>,

7  739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only

8  explain why "significant probative evidence has been rejected." <u>Id.</u>; <u>see also</u> <u>Cotter v. Harris</u>, 642 F.2d

9  700, 706-07 (3rd Cir. 1981); <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984).

10      In general, more weight is given to a treating physician's opinion than to the opinions of those who

11  do not treat the claimant. <u>Lester</u>, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

12  a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings"

13  or "by the record as a whole." <u>Batson v. Commissioner of Social Security Administration</u>, 359 F.3d 1190,

14  1195 (9th Cir.,2004); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242

15  F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the

16  opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31.  A non-examining physician's opinion

17  may constitute substantial evidence if "it is consistent with other independent evidence in the record." <u>Id.</u>

18  at 830-31; <u>Tonapetyan</u>, 242 F.3d at 1149.

19      A.    <u>Dr. Neims</u>

20      In late August, 2006, plaintiff was evaluated by Daniel M. Neims, Psy.D., who diagnosed him with

21  the following conditions: a moderate to marked depressive disorder without psychotic features, a moderate

22  generalized anxiety disorder, a moderate post traumatic stress disorder, psychological factors affecting his

23  physical condition, a personality disorder with avoidant and dependent traits, and a global assessment of

24  functioning ("GAF") score of 50, both current and within the last year. Tr. 785-86.  Dr. Neims opined that

25  the above impairments, which he deemed to be "typically of long term duration," began prior to 1999. Tr.

26  786.  He further opined as follows:

27      . . . The impairments barring the claimant from SGA [significant gainful activity] seem
        a combination of moderate mental health difficulties including Post traumatic stress
28      disorder, generalized anxiety disorder, and depressive disorder interwoven with
        physical limitations as described in the background data.  It is difficult to identify a

single unified factor responsible for his vocational impairment, rather the combination of moderate difficulties across a number of domains encumbers pre-existing characteralogical problems and leaves him poorly resilient to stress, extended social contacts, and tasks requiring sustained and persistent efforts.  His combined physical and psychological difficulties are seen as rendering his [sic] unable to sustain gainful employment for the foreseeable 12 months or longer.

Tr. 787.

    After quoting the above language in part, the ALJ went on to state as follows in his decision:

. . . Dr. Neims is clear that his opinion that the claimant is disabled is based on a combination of psychological and physical factors, and that the claimant would not be disabled solely on the basis of his moderate mental impairments.  Since evaluation of the claimant's physical limitations is beyond Dr. Neims' expertise as a psychologist, I give his opinion that the claimant is disabled little weight.  I do, however, give significant weight to his conclusion that the claimant's mental impairments are moderately limiting.

Tr. 550.  Plaintiff argues that in so finding, the ALJ ignored the low GAF score with which Dr. Neims had diagnosed him, which he asserts is based solely on psychological factors.  This, plaintiff claims, was error.  The undersigned disagrees.

    A GAF score "is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning." Langley v. Barnhart, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed.2000) ("DSM-IV-TR") at 32).  The GAF scale ranks the individual's "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Pollard v. Halter, 377 F.3d 183, 186 (2nd Cir. 2004) (quoting same).  Thus, as plaintiff points out, a GAF score appears not to be based on an individual's physical functional capabilities.

    A GAF score of 50, furthermore, is indicative of '[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning,' such as an inability to keep a job." Pisciotta v. v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007)(quoting DSM-IV-TR at 34); see also England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007) (GAF score of 50 reflects serious limitations in individual's general ability to perform basic tasks of daily life).  It is clear, however, that, as the ALJ notes, Dr. Neims found plaintiff's inability to sustain gainful employment was due to the combination of "moderate mental health difficulties" and "physical limitations," and not because of the low GAF score.  In addition, to the extent that score creates any ambiguity as to the actual basis for Dr. Neims' disability opinion, resolution of that ambiguity falls within the sole responsibility of the ALJ. See Reddick, 157 F.3d at 722; Sample, 694 F.2d

1  at 642; Morgan, 169 F.3d at 601.

2       Plaintiff insists though that it is Dr. Neims's GAF score which should take precedence.  However,

3  no legal authority has been put forth to support that position.  Plaintiff makes much of the fact that the ALJ

4  mentioned the GAF score in summarizing Dr. Neims' findings.  See Tr. 545.  The undersigned agrees that a

5  GAF score is "relevant evidence" of a claimant's ability to function mentally.  England, 490 F.3d at 1023,

6  n.8.  Nevertheless, the mere existence of a GAF score, or its mention in an ALJ's decision, does not mean

7  the validity thereof must be accepted.  Indeed, although a GAF score, for example, may be "of

8  considerable help" to the ALJ in assessing a claimant's residual functional capacity, "it is not essential" to

9  the accuracy thereof.  Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002).  The

10  ALJ here, for the reasons discussed above, did not err in not adopting Dr. Neims's GAF score.

11       B.     Dr. Ferman

12       In early February 1999, plaintiff was examined by William B. Ferman, M.D.  Plaintiff had "for the

13  most part" full range of motion in all of his joints, he was able to squat, albeit with complaints of pain, and

14  had "pretty good" range of motion on straight leg raising, though, again, with complaints of pain. Tr. 245.

15  Plaintiff appeared to have some difficulty with walking on his heels and toes, with hopping and with gait.

16  Id.  However, he could do normal bending and squatting, and had no difficulty with his hands with respect

17  to grasping and manipulation. Id.  Dr. Ferman nevertheless opined that it was "highly unlikely" plaintiff

18  would be able to do work in the future that involved "extended periods of concentration or high physical

19  activity (exercise)." Id.  On the other hand, Dr. Ferman concluded plaintiff "probably could be trained to

20  do some computer work or a desk job, carrying supplies, or being a mail sorter or distributor." Id.

21       In regard to Dr. Ferman's opinion regarding plaintiff's ability to perform work involving extended

22  periods of concentration or high physical activity, the ALJ stated that he was giving it "some but not great

23  weight since it is somewhat inconsistent with the other evidence of record." Tr. 549.  Plaintiff argues the

24  ALJ erred by failing to point out what that other evidence was.  The undersigned agrees.  It is insufficient

25  for an ALJ to reject the opinion of a treating or examining physician by merely stating, without more, that

26  there is a lack of objective medical findings in the record to support it or, as here, that it is inconsistent

27  with other evidence in the record.  See Embrey v. Bowen, 849 F.2d 418, 421 (9th Cir. 1988).

28       The undersigned, however, finds this error to be harmless in this case.  See Batson v. Commissioner

of the Social Security Administration, 359 F.3d 1190, 1197 (9th Cir. 2004) (applying harmless error

REPORT AND RECOMMENDATION
Page - 7

1   standard); Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990) (holding ALJ committed harmless error).

2   It is true that an error will be deemed to be harmless only if it is "inconsequential" to the ALJ's "ultimate

3   nondisability determination." Stout v. Commissioner, Social Security Admin., 454 F.3d 1050, 1055 (9th

4   Cir. 2006) (error harmless where it is non-prejudicial to claimant or irrelevant to ALJ's ultimate disability

5   conclusion).  Such, though, is the case here.

6          The restriction to work not involving extended periods of concentration or high physical activity is

7   entirely consistent with both the residual functional capacity with which the ALJ assessed plaintiff and the

8   other medical evidence in the record.  Specifically, the ALJ assessed plaintiff with the following residual

9   functional capacity:

10         . . . [T]hrough the date last insured, the claimant had the residual functional capacity to
        perform sedentary work.  He is able to lift 10 pounds occasionally, less than 10 pounds
11      frequently, stand or walk for at least two hours, and sit for about six hours during an
        eight hour work day, although he requires the use of a cane for walking.  As to his
12      mental abilities, he can adequately perform the mental activities generally required by
        competitive, remunerative, unskilled work as follows: understand, remember, and carry
13      out simple instructions; make judgments commensurate with the functions of unskilled
        work, i.e., simple work-related decisions; respond appropriately to supervision, co-
14      workers, and usual work situations; and deal with changes in a routine work setting not
        dealing with the general public.

15
16  Tr. 547.  Clearly, the physical portion of the above assessment involves at most sedentary work, which is

17  not inconsistent with a limitation to no "high" physical activity.[3]  Indeed, the term "sedentary" is the very

18  definition of a lack of significant physical activity.  Similarly, understanding, remembering and carrying

19  out simple instructions and making judgments commensurate with simple work-related decisions, also is

20  consistent with a restriction on no extended periods of concentration.

21         Every other medical opinion in the record regarding plaintiff's exertional capabilities, furthermore,

22  is largely consistent with Dr. Ferman's opinion and the ALJ's residual functional capacity findings with

23  respect to this area.  See Tr. 112, 116, 135, 168-69.  The same is true in regard to the medical evidence in

24  the record expressly addressing plaintiff's ability to concentrate.  Indeed, the ALJ's limitation on

25         [3]Sedentary work is defined in the Social Security Regulations as follows:

26      Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles
        like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting,
27      a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary
        if walking and standing are required occasionally and other sedentary criteria are met.
28
    20 C.F.R. § 404.1567(a).

1   plaintiff's ability to concentrate is even more restricted than most, if not all, of that evidence. See Tr. 99,

2   101, 109, 250, 253, 783.  In at least this respect then, Dr. Ferman's concentration findings are not

3   supported by the weight of the objective medical evidence in the record.  Thus, while it appears the ALJ

4   was not required to accept those particular findings, he did anyway.  Even where Dr. Ferman's opinion is

5   consistent with other medical evidence in the record, furthermore, as shown above, this does not help

6   plaintiff, as that evidence fails to establish work limitations more restrictive than those found by the ALJ.

7          C.       The Appeals Council's Directive

8          Plaintiff argues the ALJ expressly was directed by the Appeals Council in its most recent remand

9   order to give further consideration to examining source opinions, and explain what weight he was giving

10  those opinions, but erred in not doing so.  However, plaintiff has failed to argue with any specificity, other

11  than with respect to the above, how exactly the ALJ erred in this regard.  The undersigned will not make

12  that argument for plaintiff.  Accordingly, no error is found here.

13         D.       Dr. Wingate and Dr. van Dam

14         A psychiatric review technique form was completed by Terilee Wingate, Ph.D., in mid-March

15  1999, and affirmed by Carla van Dam, Ph.D., in late August 1999.  Drs. Wingate and  van Dam diagnosed

16  plaintiff with an adjustment disorder with anxiety and a personality disorder. Tr. 106-07.  As a result of

17  those impairments, they found him to have a slight restriction in his activities of daily living and moderate

18  difficulties in maintaining social functioning. Tr. 109.  Dr. Wingate and Dr. van Dam further found that

19  plaintiff seldom had deficiencies of concentration, persistence or pace. Id.  There was insufficient evidence

20  of deterioration or decompensation in a work or work-like setting. Id.

21         At the same time, Dr. Wingate completed and Dr. van Dam affirmed a mental residual functional

22  capacity assessment form, in which they found plaintiff to be markedly limited in his ability to interact

23  appropriately with the general public, and moderately limited in his ability to respond appropriately to

24  changes in the work setting. Tr. 100.  Drs. Wingate and van Dam also found him to be able to understand,

25  remember and complete one-to-three step and more complex tasks. Id.  He could sustain concentration and

26  his reasoning and judgment were both intact. Id.  On the other hand, Dr. Wingate and Dr. van Dam felt that

27  plaintiff should avoid public contact and have "low interaction" with supervisors and co-workers. Id.  In

28  addition, because plaintiff had some difficulty shifting attention and adapting to change, he would function

1  best with "clear routines." Id.

2      The ALJ gave the findings of Dr. Wingate and Dr. van Dam "significant weight, as they accurately

3  reflect[ed] the record as a whole." Tr. 550.  Plaintiff argues, however, that despite this statement, the ALJ

4  did not include in his assessment of plaintiff's residual functional capacity the limitation Drs. Wingate and

5  van Dam found in regard to low interaction with supervisors and co-workers and the finding that plaintiff

6  would do best with clear routines.  This, plaintiff argues, was error.  The undersigned agrees.

7      As clearly can be seen from the above residual functional capacity assessment, the ALJ found that

8  plaintiff could respond appropriately to supervisors and co-workers and that he could deal with changes in

9  a routine work setting not dealing with the general public.  Contrary to defendant's assertion, a restriction

10  to low interaction with others – in this case supervisors and co-workers – is not the same as the ability to

11  respond appropriately to them.  As plaintiff points out, the ability to responding appropriately

12  contemplates no limitations, whereas the ability to engage only in low interactions clearly is limiting.  The

13  ALJ did not explain why he failed to adopt this limitation and that regarding clear routines, despite giving

14  the findings of Drs. Wingate and van Dam significant weight.  This was error.

15  III.    The ALJ Did Not Err in Assessing Plaintiff's Credibility

16      Questions of credibility are solely within the control of the ALJ.  Sample v. Schweiker, 694 F.2d

17  639, 642 (9th Cir. 1982).  The Court should not "second-guess" this credibility determination.  Allen, 749

18  F.2d at 580.  In addition, the Court may not reverse a credibility determination where that determination is

19  based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a

20  claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as

21  long as that determination is supported by substantial evidence.  Tonapetyan v. Halter, 242 F.3d 1144, 1148

22  (9th Cir. 2001).

23      To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for

24  the disbelief."  Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must

25  identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.;

26  Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is

27  malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing."

28  Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering.  O'Donnell v.

1  Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

2          In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

3  evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

4  testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ

5  also may consider a claimant's work record and observations of physicians and other third parties

6  regarding the nature, onset, duration, and frequency of symptoms. Id.

7          To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her

8  daily activities. Smolen, 80 F.3d at 1284.  Such testimony may be rejected if the claimant "is able to spend

9  a substantial part of his or her day performing household chores or other activities that are transferable to a

10  work setting." Id. at 1284 n.7.  The claimant need not be "utterly incapacitated" to be eligible for disability

11  benefits, however, and "many home activities may not be easily transferable to a work environment." Id.

12  Here, the ALJ discounted plaintiff's credibility in part for the following reasons:

13          The claimant's reported activities do not comport with his reported limitations.  With
           respect to his physical functioning, the claimant informed the consultative physician
14         that he could ride his bicycle for a very long distance. 6F/1; *see also* 5F/10; 18F/63, 68.
           He participated in fishing trips and shopping trips through his VA residence, and was
15         noted to walk on a daily basis in 1998. 7E/7, 15.  Nonetheless, he reportedly has trouble
           with housekeeping due to back pain. 6E/2, 6; 7E/5; 14F/13.  As to his activities of daily
16         living, the claimant reported to the consultative physician that he could handle these
           pretty well. 9F/1.  Socially, he relates well to other residents in the VA facility where
17         he lives. 7E/11, 16; 14F/13.  He recently reported to Dr. Neims that he socializes daily
           with others at the post office. 19F/4.  One treating nurse noted that the claimant has
18         friends and visits with them daily. 7E/11.  He is able to use public transportation. 7E/6.
           The claimant enjoys reading, playing cards, doing crossword puzzles, playing computer
19         games, and making models, all of which suggest that he retains a significant degree of
           cognitive functioning. 7E/7, 16-17; 10F/3; 14F/13.  Of note, he described himself as
20         moderately low functioning in early 1997. 18F/7.

21  Tr. 548.

22          The undersigned finds the ALJ has stated valid reasons here for discounting plaintiff's credibility.

23  Plaintiff argues that these activities fail to suggest he was functioning at a significant level or that they

24  were transferable to a work setting.  Clearly, though, such activities reveal plaintiff has functioned at a

25  level that is far above that which one would expect of someone claiming disability.  In addition, those

26  activities show plaintiff was physically and mentally active in a manner commensurate with at least some

27  ability to work.  Accordingly, the ALJ did not err in discounting plaintiff's credibility in part based on his

28  activities of daily living.

The ALJ also discounted plaintiff's credibility in part as follows:

> . . . [T]he record shows that the claimant has been working consistently since the date he alleges he became disabled and unable to work.  In 1995 and 1996, the claimant worked at an incentive therapy position as an escort through the VA 18F/4, 40.  He functioned very well in this position. 18F/3.  Furthermore, the claimant has been working in the clothing room of his VA residence. 10F/3; 14F/13; 19F/4.  He organizes and oversees the clothing room operations, and helps residents find clothes and shoes. 10F/3; 19F/4.  He testified that he initially worked two to four days per week at two to three hours per day, but that he is now working four days per week and five hours per day.  While the psychiatrist hired by the claimant's attorney [Dr. Neims] characterizes this work as involving few customer contacts and minimal requirements for pace and persistence (19F/8), the claimant testified that the job involved "lots of people coming in looking for clothing and I would help them."  The fact that the claimant was able to work at all after his impairments arose suggests that he is capable of some type of work activity.

Tr. 548-49.  Again, the undersigned finds these to be valid reasons for discounting plaintiff's credibility.

Plaintiff's first challenge to the ALJ's findings here is that nowhere in the ALJ's decision was there any discussion regarding plaintiff's hearing testimony.  Clearly this is not the case, however, as the ALJ, as set forth above, expressly addressed plaintiff's testimony regarding what his job involved.  Plaintiff argues that he also testified that the work was therapeutic and paid only $1.50 per hour.  The issue here, though, is not whether plaintiff was capable of performing substantial gainful activity – which is handled at step one of the sequential disability evaluation process – but, rather, whether the work he did engage in evidenced an ability to function in a manner not indicative of disability.  Such is the case here.

Plaintiff further argues that the ALJ ignored or overlooked the fact that he would miss one day of work per week.  Again, clearly this is not the case, as the ALJ expressly noted that while plaintiff "testified that he initially worked two to four days per week at two to three hours per day," further testimony revealed the he was "now working four days per week and five hours per day." Tr. 548-49.  In any event, the record shows that at the most recent hearing, plaintiff actually testified that although prior to the year 2000, he was missing work "closer to once a week," currently he was missing work "[a]bout once a month." Tr. 819.  Thus, this shows plaintiff has even a greater capacity to remain at work than is being alleged, and, indeed, falls within the range of what the vocational expert testified at the most recent hearing as being acceptable in terms of missing work. See Tr. 832.  Regardless, as discussed above, the purpose here is not necessarily to establish plaintiff's ability to perform substantial gainful activity, but instead his capacity to function in a work-like setting.  The ALJ was not remiss in relying on this evidence to establish that here.

1  IV.    <u>The ALJ Erred in Assessing the Lay Witness Evidence in the Record</u>

2        Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into

3  account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to

4  each witness for doing so." <u>Lewis v. Apfel</u>, 236 F.3d, 503, 511 (9th Cir. 2001).  An ALJ may discount lay

5  testimony if it conflicts with the medical evidence. <u>Id.</u>; <u>Vincent v. Heckler</u>, 739 F.2d 1393, 1395 (9th Cir.

6  1984) (proper for ALJ to discount lay testimony that conflicts with available medical evidence).  In

7  rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons"

8  for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to

9  those reasons," and substantial evidence supports the ALJ's decision. <u>Lewis</u>, 236 F.3d at 512.  The ALJ

10  also may "draw inferences logically flowing from the evidence." <u>Sample</u>, 694 F.2d at 642.

11        In this case, the ALJ addressed the lay witness evidence in the record as follows:

12        In late 1996 and early 1997, Mark Adams, TA, the claimant's case manager, noted on
        several occasions that the claimant showed progress but was not yet ready for
13        employment. 18F/4, 8, 10-12, 17, 26, 28, 30, 32-33, 36-37. Mr. Adams then noted in
        February of 1997 that the "tx team never feels that this vet. will be highly functionable
14        again due to his emotional state and physical state." 18F/13.  Mr. Adams noted in
        March or April of 1997 that the claimant may be able to obtain "a moderately low
15        stress job (such as a Video store employee or etc.) . . . Vet in my opinion has
        progressed but will always be moderately disabled due to his emotional state and
16        physical state." 18F/7.  I give this opinion some but not great weight.

17        Roger Spiese, LPN, the nurse in charge of the claimant's care at the Retsil VA home,
        submitted an activities of daily living questionaire in December of 1998. 7E/10-18.
18        Mr. Spiese notes that the claimant has had episodes of explosive behavior. 7E/10.  He
        indicates that the claimant is forgetful and usually has a slightly depressed mood.
19        7E/10-11.  He reports, however, that the claimant is friendly with other residents and
        visits them daily. 7E/11.  I give this opinion some but not great weight since the
20        claimant was quite new to the facility at the time this opinion was issued.

21        Another individual affiliated with the Retsil VA home submitted an Activities of Daily
        Living questionaire in December of 1998. 7E/1-9.  This person indicates that the
22        claimant has ongoing periods of confusion, mood swings, anger outbursts, anxiety, and
        trouble with memory. 7E/1-3.  I also give this opinion some but not great weight
23        because the claimant had not been at the facility very long at the time the opinion was
        issued.

24  Tr. 549.

25        First, with respect to Mr. Adams's opinion, plaintiff argues the ALJ erred by failing to explain what

26  he meant by giving that opinion some but not great weight.  The undersigned agrees. The Court is left to

27  guess here why the ALJ gave only some weight to Mr. Adams's opinion, and, to the extent that the ALJ

28  did adopt that opinion, how he applied it with respect to plaintiff.  Plaintiff further argues, and apparently

REPORT AND RECOMMENDATION
Page - 13

1   defendant agrees, that the ALJ erred in rejecting the statements from the other lay witnesses, because the

2   record shows plaintiff already had been at the particular facility where they worked for a substantial period

3   of time when those statements were made.  Thus, the ALJ erred here too.

4        Plaintiff argues the above lay witness statements support his credibility.  As discussed previously,

5   however, the ALJ gave valid reasons separate from the lay evidence for discounting his credibility.  Thus,

6   the fact that the ALJ may have erred here, does not mean his credibility determination concerning plaintiff

7   himself was improper.  In other words, the ALJ had other valid independent reasons for discounting his

8   credibility.  Plaintiff further argues the above lay witness testimony is consistent with a GAF score of 50

9   with which he was assessed while at the VA home.  It is not at all clear, however, that this is the case, even

10   considering the statements from Mr. Adams that plaintiff did not yet seem ready for employment.  That is,

11   there is no evidence in the record that specifically equates the two.

12   V.    The ALJ's Assessment of Plaintiff's Residual Functional Capacity

13        If a disability determination "cannot be made on the basis of medical factors alone at step three of

14   the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and

15   assess his or her "remaining capacities for work-related activities."  SSR 96-8p, 1996 WL 374184 *2.  A

16   claimant's residual functional capacity assessment is used at step four to determine whether he or she can

17   do his or her past relevant work, and at step five to determine whether he or she can do other work.  Id.  It

18   thus is what the claimant "can still do despite his or her limitations."  Id.

19        A claimant's residual functional capacity is the maximum amount of work the claimant is able to

20   perform based on all of the relevant evidence in the record.  Id.  However, a claimant's inability to work

21   must result from his or her "physical or mental impairment(s)."  Id.  Thus, the ALJ must consider only

22   those limitations and restrictions "attributable to medically determinable impairments."  Id.  In assessing a

23   claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-

24   related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the

25   medical or other evidence."  Id. at *7.

26        As noted above, the ALJ assessed plaintiff with the following residual functional capacity:

27        . . . [T]hrough the date last insured, the claimant had the residual functional capacity to
         perform sedentary work.  He is able to lift 10 pounds occasionally, less than 10 pounds
28        frequently, stand or walk for at least two hours, and sit for about six hours during an
          eight hour work day, although he requires the use of a cane for walking.  As to his

REPORT AND RECOMMENDATION
Page - 14

mental abilities, he can adequately perform the mental activities generally required by competitive, remunerative, unskilled work as follows: understand, remember, and carry out simple instructions; make judgments commensurate with the functions of unskilled work, i.e., simple work-related decisions; respond appropriately to supervision, co-workers, and usual work situations; and deal with changes in a routine work setting not dealing with the general public.

Tr. 547. Plaintiff argues that given the ALJ's errors in evaluating the medical and lay witness evidence in the record, and in assessing his own credibility, the ALJ's assessment of his residual functional capacity was improper. As discussed above, the ALJ did err in evaluating the medical evidence provided by Drs. Wingate and van Dam, as well as in evaluating the lay witness evidence in the record. For this reason, it cannot clearly be said that the residual functional capacity with which the ALJ assessed plaintiff included all of plaintiff's limitations. As such, the undersigned agrees the ALJ erred here.

VI.    The ALJ's Step Five Analysis

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 404.1520(d), (e). The ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984). The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988). Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record." Embrey, 849 F.2d at 422 (citations omitted). The ALJ, however, may omit from that description those limitations he or she finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

At the most recent hearing, the ALJ posed a hypothetical question to the vocational expert, which reads in relevant part:

. . . I want to describe a vocational profile of a younger individual with and it's not for certain, 9 or 10 years of education and even 11 at one point where it's described, so somewhere less than a high school education and past relevant work as a dishwasher

1
2
3
4
5

> and security guard.  And this individual has the capability to perform sedentary exertional activities so far as he can when he gets up to walk across the room he needs to take his cane with him to prevent a potential fall because joints should give way. Combine that with the cognitive ability that he can adequately perform the mental activities generally required by competitive remunerative unskilled work as follows, that is, he can understand, remember and carry out simple instructions, can make judgments commensurate with the functions of unskilled work, i.e. simple work-related decisions, can respond appropriately to supervision, coworkers in usual work situations and can deal with changes in a routine work setting not dealing with general public. . . .

6  Tr. 823-24.

7       In response to this hypothetical question, the vocational expert testified that there were other jobs

8  such an individual could perform. Tr. 824-30.  Based on the vocational expert's testimony, the ALJ found

9  plaintiff capable of performing other jobs existing in significant numbers in the national economy. Tr. 551.

10  As he did with the ALJ's assessment of his residual functional capacity, plaintiff argues the hypothetical

11  question the ALJ posed failed to adequately describe all of his limitations, given the errors the ALJ made

12  in evaluating the medical and other evidence in the record.  Again, in light of the ALJ's errors in

13  evaluating the findings of Dr. Wingate and Dr. van Dam and the lay witness evidence in the record, it is

14  not clear that the hypothetical question contained all of plaintiff's actual limitations.  Thus, for this reason,

15  it cannot be said with certainty that the ALJ's step five findings were proper.

16       Plaintiff also argues that additional testimony provided by the vocational expert establishes that he

17  is incapable of performing any work.  The undersigned disagrees.  At the most recent hearing, plaintiff's

18  counsel added the following conditions to the ALJ's hypothetical question: the need to get up and  walk

19  around for five to ten minutes after sitting for 45 minutes; difficulty in concentrating involving times when

20  plaintiff's mind "just goes completely blank" once or twice each in the morning and afternoon; and

21  missing one day of work per week. Tr. 831-32.  In response, the vocational expert testified that with any of

22  those limitations, plaintiff would not be able to maintain employment. Id.  However, plaintiff has not

23  shown that the medical or other evidence in the record establishes the existence of these specific

24  limitations.  Further, to the extent those limitations are based on plaintiff's own testimony, as discussed

25  above, the ALJ did not err in discounting his credibility.  Thus, the ALJ was not required to adopt them

26  here.

27       Lastly, plaintiff argues the ALJ erred in finding he was capable of performing the particular jobs

28  the vocational expert identified at the most recent hearing.  At that hearing, the vocational expert testified

that plaintiff could perform the following jobs: grinding machine operator (Dictionary of Occupational Titles ("DOC") 690.685-194); ink printer (DOT 652.685-038); call out operator (DOT 237.367-014); and circuit board assembler (DOT 726.684-110). Tr. 824-28.  With respect to this particular testimony, the ALJ found as follows:

> I heard testimony from a vocational expert at the hearing, but the vocational expert had some problems.  The vocational expert testified that a hypothetical individual with the claimant's residual functional capacity would be able to perform other work as a grinding machine operator (D.O.T. number 690.685-194, sedentary exertion, SVP 2), an ink printer (D.O.T. number 652.685-038, sedentary exertion, SVP 2), a call out operator (D.O.T. number 237.367-014, sedentary exertion, SVP 2), or circuit board assembly (D.O.T. number 726.684-110, sedentary exertion, unskilled).  There are thousands of these jobs existing in the economy.  Furthermore, the vocational expert readily admitted that sedentary unskilled assembly jobs existed in the thousands.  The vocational testimony about decline in assembly jobs due to outsourcing is not relevant for the period adjudicated.

Tr. 551.

The ALJ has the affirmative responsibility to ask the vocational expert about possible conflicts between her testimony and information in the DOT. Haddock v. Apfel, 196 F.3d 1084, 1091 (10th Cir. 1999); SSR 00-4p, 2000 WL 1898704.  Before relying on evidence obtained from a vocational expert to support a finding of not disabled, therefore, the ALJ is required to "elicit a reasonable explanation for any discrepancy" with the DOT. Haddock, 196 F.3d at 1087; SSR 00-4p, 2000 WL 189704 *1.  The ALJ also must explain in his or her decision how the discrepancy or conflict was resolved. SSR 00-4p, 2000 WL 189704 *4.  Plaintiff argues the above four jobs identified by the vocational expert and adopted by the ALJ conflict with the descriptions of those jobs contained in the DOT.  This conflict, plaintiff further argues, was never explained by the ALJ as he was required to do.

Specifically, plaintiff argues that while the ALJ limited him to understanding, remembering, and carrying out simple instructions and making judgments commensurate with simple work-related decisions, each of the above jobs are described by the DOT as requiring a level of reasoning requiring higher abilities in those areas.  The job definitions contained in the DOT consist of various descriptive components.  One of those components is general educational development ("GED"), which is described as follows:

> General Educational Development embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance. This is education of a general nature which does not have a recognized, fairly specific occupational objective. Ordinarily, such education is obtained in elementary school, high school, or college. However, it may be obtained from experience and self-study.

1  DOT Appendix C.  The GED is composed of three "divisions": "Reasoning Development," "Mathematical

2  Development" and "Language Development." Id.  Reasoning Development, in turn, consists of six levels

3  of reasoning ability, with Level 6 being the highest. Id.

4          The jobs of grinding machine operator, ink printer and circuit board assembler each require Level 2

5  reasoning, while the job of call out operator requires Level 3 reasoning[4], which are defined respectively as

6  follows:

7          LEVEL 2

8          Apply commonsense understanding to carry out detailed but uninvolved written or oral
           instructions. Deal with problems involving a few concrete variables in or from
9          standardized situations.

10         LEVEL 3

11         Apply commonsense understanding to carry out instructions furnished in written, oral,
           or diagrammatic form. Deal with problems involving several concrete variables in or
12         from standardized situations.

13  DOT 690.685-194; DOT 652.685-038; DOT 726.684-110; DOT 237.367-014.  Plaintiff asserts though that

14  the ability to understand, remember, and carry out simple instructions and make judgments commensurate

15  with simple work-related decisions is analogous to Level 1 reasoning, which is:

16         Apply commonsense understanding to carry out simple one- or two-step instructions.
           Deal with standardized situations with occasional or no variables in or from these
17         situations encountered on the job.

18  DOT Appendix C.  Thus, plaintiff argues he is incapable of performing any of those jobs.

19         The undersigned agrees that the limitation to simple instructions and decisions adopted by the ALJ

20  is inconsistent with the Level 3 reasoning the DOT described the job of call out operator requiring, as it

21  does not appear that any court has found the two to be consistent with each other.  See Hackett v. Barnhart,

22  395 F.3d 1168, 1176 (10th Cir. 2005) (finding limitation to simple and routine work to be inconsistent

23  with demands of Level 3 reasoning).  Because the ALJ failed to elicit an explanation from the vocational

24  expert with respect to the conflict between the vocational expert's testimony and the definition of the job

25  of call out operator contained in the DOT, the ALJ erred in relying on that expert's testimony to find

26  plaintiff to be capable of performing that job.

27

28
           [4]Plaintiff states, and defendant does not claim otherwise, that the job of call out operator only requires Level 2 reasoning.
       Clearly, however, the DOT definition of that job shows differently. See DOT 237.367-014.

The undersigned disagrees, however, that the ALJ's limitation to understanding, remembering and carrying out simple instructions and to making simple decisions is commensurate with Level 1 reasoning in this case.  As pointed out by defendant, several courts have found Level 2 reasoning to be consistent with the ability to do simple, routine and/or repetitive work tasks. See, e.g., Hackett v. Barnhart, 395 F.3d 1168, 1176 (10th Cir. 2005) (finding Level 2 reasoning to be more consistent with limitation to simple, routine work tasks); Meissl v. Barnhart, 403 F.Supp.2d 981, 983-85 (C.D. Cal. 2005) (finding limitation to simple and repetitive tasks to be closer to Level 2 reasoning); Flaherty v. Halter, 182 F.Supp.2d 824, 850-51 (D. Minn. 2001) (finding Level 2 reasoning did not conflict with limitation to work involving simple, routine, repetitive, concrete, and tangible tasks).

It is true that at least one court appears to disagree with the position taken by the above courts. Lucy v. Chater, 113 F.3d 905, 909 (8th Cir. 1997) (rejecting contention that claimant limited to following only simple instructions can engage in full range of sedentary work because many unskilled jobs in that category require reasoning levels of 2 or higher).  However, the undersigned finds more persuasive the discussion of this issue made by the United States District Court for the Central District of California:

> This leaves the question of whether the vocational expert's opinion contradicted the DOT's descriptions for Meissl's other work as a stuffer given the ALJ's RFC finding limiting Meissl to "simple, repetitive" tasks. The Court finds that it does not.
>
> As one goes up the numerical reasoning development scale used by the DOT, the level of detail involved in performing the job increases while the job task becomes less routine. For example, a job with a reasoning level of one only requires that the worker be able to "[a]pply commonsense understanding to carry out simple one-or two-step instructions" in "standardized situations with occasional or no variables." DOT at 1011. In contrast, a job with a reasoning level of three would require that the worker "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and deal "with problems involving several concrete variables ...." DOT at 1011. The middle ground between these two points is also where the vocational expert identified a job with the lowest reasoning development score that Meissl could perform, namely a stuffer.
>
> A job with a reasoning level of two requires that the worker "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and deal with problems "involving a few concrete variables ...." DOT at 1011. Thus, such a job would involve more detail, as well as a few more variables, than that with a reasoning level of one. The question becomes whether a person limited to carrying out simple, repetitive instructions could still perform a job with such a reasoning score.
>
> Meissl focuses on the fact that the DOT description for a reasoning level of 2 uses the word "detailed." Essentially, Meissl seeks to equate the DOT's use of the word "detailed" with the Social Security regulations' use of the word "detailed instructions" in formulating a claimant's mental RFC. The Court is not convinced that such a neat, one-to-one parallel exists between the two.

The Social Security regulations separate a claimant's ability to understand and remember things and to concentrate into just two categories: "short and simple instructions" and "detailed" or "complex" instructions. 20 C.F.R. § 416.969a(c)(1)(iii); *see also* 20 C.F.R. part 404, subpart P, Appendix 1, Listing 12.00C(3) ("You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks"). The DOT, on the other hand, employs a much more graduated, measured and finely tuned scale starting from the most mundane ("simple one- or two-step instructions" at level one), moving up to the most complex ("applying principles of logical or scientific thinking ... apprehend the most abstruse classes of concepts" at level six). DOT at 1010-1011. To equate the Social Security regulations use of the term "simple" with its use in the DOT would necessarily mean that all jobs with a reasoning level of two or higher are encapsulated within the regulations' use of the word "detail." Such a "blunderbuss" approach is not in keeping with the finely calibrated nature in which the DOT measures a job's simplicity.

Even more problematic for Meissl's position is that she ignores the qualifier the DOT places on the term "detailed" as also being "uninvolved." This qualifier certainly calls into question any attempt to equate the Social Security regulations' use of the term "detailed" with the DOT's use of that term in the reasoning levels. Instead of simply seeking to equate the two scales based on the serendipity that they happen to employ the same word choice, a much more careful analysis is required in comparing the claimant's RFC with the DOT's reasoning scale.

Here, the ALJ found that Meissl could perform not just simple tasks but also ones that had some element of repetitiveness to them. A reasoning level of one on the DOT scale requires slightly less than this level of reasoning. While reasoning level two notes the worker must be able to follow "detailed" instructions, it also (as previously noted) downplayed the rigorousness of those instructions by labeling them as being "uninvolved."

The Court finds that there is much to recommend for believing that Meissl's reasoning level is at level two rather than at level one. A reasoning level of one indicates, both by the fact that it is the lowest rung on the development scale as well as the fairly limited reasoning required to do the job, as applying to the most elementary of occupations; only the slightest bit of rote reasoning being required. For example, the DOT describes the following jobs as requiring only a reasoning level of one: Counting cows as they come off a truck (job title Checker (motor trans.)); pasting labels on filled whiskey bottles (job title Bottling-Line Attendant (beverage)); and tapping the lid of cans with a stick (job title Vacuum Tester, Cans). *See* DOT at 931, 936, 938. Someone able to perform simple, repetitive instructions indicates a level of reasoning sophistication above those listed. Other courts have so held. *See Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir.2005) (holding that "level-two reasoning appears more consistent with Plaintiff's RFC" to "simple and routine work tasks"); *Money v. Barnhart*, 91 Fed.Appx. 210, 214, 2004 WL 362291, at *3 (3rd Cir.2004) ("Working at reasoning level 2 would not contradict the mandate that her work be simple, routine and repetitive"). As one court explained:

The ALJ's limitation for the Plaintiff, with respect to an appropriate reasoning level, was that she could perform work which involved simple, routine, repetitive, concrete, tangible tasks. Therefore, the DOT's level two reasoning requirement did not conflict with the ALJ's prescribed limitation. Although the DOT definition does state that the job requires the understanding to carry out detailed instructions, it specifically caveats that the instructions would be uninvolved-that is, not a high level of reasoning.

*Flaherty v. Halter*, 182 F.Supp.2d 824, 850 (D.Minn.2001).

1    <u>Meissl v. Barnhart</u>, 403 F.Supp.2d 981, 983-85 (C.D.Cal. 2005).

2          This case is somewhat different than the situation facing the district court in <u>Meissl</u>.  As discussed

3    by the district court above, in <u>Meissl</u> the ALJ limited the claimant to simple and repetitive tasks, whereas

4    the ALJ in this case limited plaintiff to understanding, remembering and carrying out simple instructions

5    and to making judgments commensurate with simple decisions.  At first glance, the ALJ's limitations here

6    would appear to be more consistent with Level 1 reasoning, and its emphasis on "simple" instructions.  As

7    the <u>Meissl</u> court noted, however, Level 1 reasoning is "the lowest rung on the development scale," which

8    involves "fairly limited reasoning required to do the job," and is to be applied to "the most elementary of

9    occupations," with "only the slightest bit of rote reasoning being required." <u>Id.</u> at 984.

10         It is true that in finding the claimant in that case could perform Level 2 reasoning, the district court

11   in <u>Meissl</u> focused on the ALJ's finding that the claimant could do "not just simple tasks but also ones that

12   had some element of repetitiveness to them."  While it also is true that the ALJ here made no such finding

13   regarding repetitiveness, the ALJ gave no indication that he intended to limit plaintiff to those type of jobs

14   requiring "only the slightest bit of rote reasoning."  Rather, the ALJ appears to have intended the opposite.

15   For example, the ALJ found as well that plaintiff could "adequately perform the mental activities generally

16   required by competitive, remunerative, unskilled work." Tr. 547.  Although, as explained below, unskilled

17   work is not analogous to the ability to reason, this statement does indicate the ALJ did not mean to relegate

18   plaintiff to the "lowest rung" on the reasoning development scale.

19         The undersigned though specifically rejects defendant's other stated reason for arguing that the

20   ALJ properly found plaintiff could perform the jobs of grinding machine operator, ink printer and circuit

21   board assembler.  Defendant notes that the ALJ found plaintiff could do unskilled work.  She argues that

22   because each of the above three jobs is defined by the DOT as having a specific vocational preparation

23   ("SVP") of 2 (which is another GED descriptive component requiring "[a]nything beyond short

24   demonstration up to and including 1 month" to perform the particular job), and because an SVP of 2 is

25   consistent both with unskilled work and a restriction to simple work tasks, there is no inconsistency

26   between the vocational expert's testimony and the DOT's description of those jobs.  The undersigned,

27   however, previously has rejected this approach, and does so again here.

28         In attempting to equate an SVP of 2 with the ALJ's limitation to simple instructions and simple

1  decisions, defendant relies on the Commissioner's definition of unskilled work, which is work "which

2  needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20

3  C.F.R. § 404.1568(a).  A job is deemed unskilled if "a person can usually learn to do the job in 30 days,

4  and little specific vocational preparation and judgment are needed." Id.; see also SSR 00-4p, 2000 WL

5  1898704 *3 ("[U]nskilled work corresponds to an SVP of 1-2.").  Defendant's argument is at odds with

6  other courts who have considered this issue.  Although the Ninth Circuit itself has not decided this issue,

7  again the Meissl court has done so, resolving it convincingly as follows:

8   Key to the present case is the ALJ's finding that Meissl's ailments limited her
    to work involving simple tasks performed at a routine or repetitive pace.
9   Meissl asserts that such a restriction is inconsistent with her ability to perform
    any of the other work as the descriptions of those jobs in the Dictionary of
10  Occupational Titles ("DOT") require a higher reasoning capacity than that
    allowed by the ALJ's RFC.
11
    Meissl argues that the rub comes from the fact that the other work, which the
12  ALJ pointed to as something which she could perform and, hence, the reason
    for denying her benefits, requires a level of reasoning beyond that
13  contemplated as "simple, repetitive."

14  The DOT describes the stuffer job as requiring a reasoning level of two out of
    a six-point scale. A level two reasoning indicates that the job requires the
15  person to be able to "[a]pply commonsense understanding to carry out
    detailed but uninvolved written and oral instructions," and "[d]eal with
16  problems involving a few concrete variables in or from standardized
    situations." DOT 1011 (4th ed. rev. 1991). This leaves the question of whether
17  such a reasoning level is consonant with a limitation to simple, repetitive
    mental tasks.
18
    The Commissioner argues that it does, but does so by pointing to a separate
19  vocational consideration listed in the DOT-a job's specific vocational
    preparation ("SVP") score.  The stuffer job is considered an unskilled one
20  under the DOT's SVP scores. The Commissioner contends that because the
    job had an SVP level of two, which essentially is unskilled work, the
21  vocational expert's opinion does not conflict with the DOT. . . . Unskilled
    work is defined under Social Security regulations as requiring little or no
22  judgment to do simple duties that can be learned on the job in a short period
    of time. See 20 C.F.R. § 416.968(a). Because the job duties for Meissl's work
23  as a stuffer would be simple ones, the Commissioner posits that the reasoning
    required to perform those jobs must necessarily be simple as well and, hence,
24  not in conflict with the ALJ's "simple, repetitive" functional restriction.

25  The problem for the Commissioner is that she is conflating two separate
    vocational considerations. Other courts decided that, contrary to the
26  Commissioner's argument here, the SVP level in a DOT listing indicating
    unskilled work, does not address whether a job entails only simple, repetitive
27  tasks. See, e.g., Lucy v. Chater, 113 F.3d 905, 909 (8th Cir.1997); Cooper v.
    Barnhart, 2004 WL 2381515, at *4 (N.D.Okla. Oct.15, 2004); Hall v.
28  Barnhart, 2004 WL 1896969, at *3 (D.Me. Aug.25, 2004). A job's SVP is
    focused on "the amount of lapsed time" it takes for a typical worker to learn

the job's duties. DOT at 1009. A job's reasoning level, by contrast, gauges the minimal ability a worker needs to complete the job's tasks themselves. As one court noted, "SVP ratings speak to the issue of the level of vocational preparation necessary to perform the job, not directly to the issue of a job's simplicity, which appears to be more squarely addressed by the GED [reasoning level] ratings." *Hall-Grover v. Barnhart*, 2004 WL 1529283, at *4 (D.Me. April 30, 2004). Here, the one vocational consideration directly on point with the limitation contained in the RFC is a job's reasoning level score.

403 F.Supp.2d at 982-83 (footnote omitted).  Once more, the undersigned finds the reasoning of the above

district court's opinion, and that of the other courts cited and quoted therein, persuasive, and hereby adopts

it. See, e.g., Cooper, 2004 WL 2381515 at *4 ("The explanations of SVP in the DOT suggest that the SVP

specifies the vocational preparation required to perform a job. The reasoning level . . . appears more

similar to whether or not a claimant has a limitation to performing only simple tasks.").  Indeed, this

appears to be the approach taken by other circuit courts as well:

The Social Security's own list of unskilled sedentary jobs . . . indicates that many jobs within this range require more than the mental capacity to follow simple instructions.  For each job described, the *Dictionary of Occupational Titles* specifies the type of reasoning capabilities the job requires. 2 U.S. Dep't of Labor, *Dictionary of Occupational Titles*, 1010-11 (4th ed. 1991). For instance, a job rated reasoning level one requires the ability to understand and carry out simple instructions, whereas a job rated reasoning level two requires the ability to understand and carry out detailed instructions. *Id.* at 1011. Many of the jobs listed require level two reasoning or higher in the unskilled sedentary job category.

Lucy, 113 F.3d at 909.  Nevertheless, as explained above, there is no inconsistency between the three jobs

identified by the vocational expert and adopted by the ALJ requiring level 2 reasoning and the limitation to

simple instructions and decisions.  Thus, the ALJ did not err here at step five on this basis, though remand

is required in light of the above issues concerning the hypothetical question that was posed.

VII.   This Matter Should Be Remanded for Further Administrative Proceedings

The Court may remand this case "either for additional evidence and findings or to award benefits."

Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course,

except in rare circumstances, is to remand to the agency for additional investigation or explanation."

Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in

which it is clear from the record that the claimant is unable to perform gainful employment in the national

economy," that "remand for an immediate award of benefits is appropriate." Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative

proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because issues remain in regard to the medical and lay witness evidence in the record, plaintiff's residual functional capacity and his ability to perform other work existing in significant numbers in the national economy, this matter should be remanded to the Commissioner for further administrative proceedings.

Plaintiff argues that the lay witness evidence in the record must be credited as true under Schneider v. Barnhart, 223 F.3d 968 (9th Cir. 2000), thereby requiring remand for an outright award of benefits.  The undersigned disagrees.  It is true that where lay witness evidence is improperly rejected, that testimony may be credited as a matter of law.  Id. at 976 (finding that when lay evidence rejected by ALJ is given effect required by federal regulations, it became clear claimant's limitations were sufficient to meet or equal listed impairment).  As subsequently noted by the Ninth Circuit in Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003), however, the courts do have "some flexibility" in how they apply the "credit as true" rule.  Id. at 876.  Further, Schneider, unlike in this case, dealt with the situation where the Commissioner failed to cite any evidence to contradict the statements of five lay witnesses regarding her disabling impairments. 223 F.3d at 976.  Thus, the undersigned rejects plaintiff's argument here.

Nevertheless, the undersigned does recognize that this will be the third time this matter will be sent back to the Commissioner for further administrative proceedings.  As such, the undersigned certainly can sympathize with plaintiff's situation.  The evidence in the record, however, simply fails to establish at this time that plaintiff would be required to be found disabled.  In an effort to hopefully streamline the process, though, the undersigned finds that on remand this matter should be given to a different ALJ, as ALJ Adams already has had two chances to get things right, but has failed to do so.  In addition, the undersigned hereby makes clear that on remand only the following issues should be dealt with: (1) re-evaluate the findings and opinions of Drs. Lewis and van Dam; (2) re-evaluate the lay witness statements in the record; (3) re-assess plaintiff's residual capacity based on those re-evaluations; and (4) re-consider whether plaintiff is capable of performing other jobs existing in significant numbers in the national

1   economy in light of her re-assessed residual functional capacity.

2                                   CONCLUSION

3          Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff

4   was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for

5   further administrative proceedings in accordance with the findings contained herein.

6          Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b),

7   the parties shall have ten (10) days from service of this Report and Recommendation to file written

8   objections thereto. See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those

9   objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit

10  imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **April 25, 2008**,

11  as noted in the caption.

12         DATED this 31st day of March, 2008.

13

14

15                                          Karen L. Strombom
                                            United States Magistrate Judge
16

17

18

19

20

21

22

23

24

25

26

27

28

REPORT AND RECOMMENDATION
Page - 25